JOHN E. HILL, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 3178

June 1, 1937.                                      68 P. (2d) 569.

*J. M. Frame,* for Appellant:

*Gray Mashburn,* Attorney-General; *W. T. Mathews* and *W. Howard Gray,* Deputy Attorneys - General; *Ernest S. Brown,* District Attorney, and *Nash P. Morgan,* Deputy District Attorney, for the State:

## OPINION

By the Court, TABER, J.:

Defendant was convicted of murder of the second degree in department No. 2 of the Second judicial district court, Washoe County, and sentenced to imprisonment in the state prison for from ten years to life. This appeal is taken from the judgment, and from an order of said district court denying a motion for new trial.

Between 6 and 6:30 o'clock on the morning of May 12, 1936, on the sidewalk on the west side of Center street between Douglas alley and Commercial row in the city of Reno, witnesses observed defendant, aged seventy, and one Theodore Zoebel, aged eighty, engaged in a violent physical altercation. Aside from the participants, there does not appear to have been any eyewitness to the beginning of the combat. Zoebel died from stab wounds inflicted upon him by defendant in said encounter. The killing is admitted, but at his trial appellant pleaded self-defense.

Police Officer J. L. Geach testified that upon arriving at the scene of the trouble, he saw Zoebel lying on the sidewalk, and upon being told by by-standers that the man who had done the cutting had proceeded west on Commercial row, he and Officer Dean went partly around the block to the intersection of Virginia street and Douglas alley. There, one Ed Walters pointed to defendant, who at that time was going east in Douglas alley. Thereupon the officers went around to the front entrance of the Wine House on Commercial row, and Officer Geach went through the Wine House and out its back door on Douglas alley, when he again saw defendant proceeding east in that alley between the rear

of the Wine House and Center street. The officer caught up with defendant and arrested him just as he was turning into Center street from Douglas alley, about 40 feet south of the place where the officer first found Zoebel lying on the sidewalk.

Defendant was with the officers when they took Zoebel to the hospital. On the way, defendant volunteered the statement two or three times that he was justified in what he had done. When Zoebel was taken into the hospital, Officer Dean also went in, while Geach remained outside with defendant. At this time defendant again stated that he was justified in what he had done and went on to tell Officer Geach that he had just protected himself as would any other citizen.

In going through defendant's pockets at the police station, Mr. Geach found some pieces of rope, a pocket knife, and a piece of toilet paper stained with what appeared to be blood. Defendant also had a package on his arm, tied with a string. In it was defendant's lunch. Amongst other things, the lunch package contained a small filled jar, which had been cracked. The pocket knife was an ordinary brown bone-handled pocket knife, with two blades. This is the knife with which defendant claims he stabbed Zoebel. There was no appearance of blood or blood stains on either of the blades of this knife. Defendant told the officer he had wiped the blood off the knife with his fingers. The officer did not notice any bruises, scratches, or abrasions on defendant's face.

After searching defendant at the police station, the officer went back to the scene of the trouble for the purpose of trying to find witnesses who had seen the trouble start. This was about fifty minutes after he had first been called there. While standing in front of the Bank Club, just south of Douglas alley on Center street, a man identifying himself as a Mr. Mix, in the employ of the Nevada State Journal, handed him a knife. It was a pocket knife "without handles on, a long blade, I might say the blade was about three inches at least, and this

blade was wired open." There were blood stains on the blade. After handing this knife to the officer, Mr. Mix took him to the toilet of the Wine House and there showed him a garbage can in which there was what appeared to the officer to be a broken bottle and a little water.

Officer Geach further testified that on the second day after the trouble, he inspected the cabin in which defendant had been living, and there found some wire; on the next day he also found there a pair of cheap pliers. The pliers, the wire, both knives, and the stained paper were admitted in evidence at the trial.

Mr. Geach further testified that on the day of the trouble, after defendant's arrest, in the office of the chief of police, defendant stated that there had been bad blood between him and Zoebel for eight years; that he had been attacked by Mr. Zoebel; and that upon one occasion Mr. Zoebel had caused his arrest. On May 12, and again on May 15, defendant stated that at the time of the trouble on the morning of May 12, Zoebel attacked him with a ramal.

Officer Geach testified that on May 15 defendant denied ownership of the knife which had been handed the officer by Mr. Mix; also that defendant said he had gone in the front door of the Wine House and out the back door on the morning of the trouble, but that this was before the altercation.

With reference to the wire found in defendant's premises, Mr. Geach testified on cross-examination that he would say it was the kind commonly used by electricians and for various purposes, but he was not in a position to qualify; that it had been his observation that this kind of wire was commonly used and generally on the market, and often used in the city of Reno. Also on cross-examination he admitted that he was not to be understood as testifying positively that the stains on the larger knife were blood. Defendant from the first, says Mr. Geach, consistently maintained that he was

justified in stabbing Zoebel. This officer estimated that Zoebel was about 5 feet 10 inches tall, and weighed from 140 to 150 pounds.

Charles Warren Mix, the man who handed Officer Geach the knife with which the state claims Zoebel was stabbed, did not appear as a witness at the trial, but his deposition taken at the preliminary examination was admitted in evidence over defendant's objections, which will be considered later in this opinion. The substance of Mr. Mix's testimony follows: On the morning of the trouble, he had occasion to go to the men's toilet in the rear of the Wine House adjoining Douglas alley. He noticed a knife in the garbage can where there was about half an inch of water. He had previously heard that somebody had been stabbed. He picked up the knife and when he saw the officers, handed the knife to Officer Geach. He identified the larger knife with the longer blade as the one he handed the officer. It was wrapped with wire when he found it just as it was when he examined it in court. It had a stain on the blade. He could not exactly say whether it was blood or not.

Ed Walters, occupation building trades, who had lived in Reno about ten years, testified that on the morning of the trouble, while in the front entrance of the Palace Club, he noticed defendant and Zoebel scuffling on the sidewalk on Center street about half way between Douglas alley and Commercial row. Zoebel was bleeding very badly and was following defendant, who was coming towards witness. As they came nearer, Zoebel staggered and fell on the sidewalk. Witness picked him up and put him over to the side of the building, noticing that he was badly cut on the left side of the face, and that there was a cut also under the left arm. Defendant walked on over to the corner and stood there mumbling, then he started west on Commercial row. Witness followed defendant to Virginia street and told him not to cross that street. Defendant turned to the left on Virginia street and went south to Douglas alley and

then started east in that alley. Witness saw officers coming, stopped them and informed them that defendant had just entered the rear of the Wine House, and as witness neared this back entrance, defendant came out and started east again in Douglas alley. Witness pointed out defendant to Officer Geach, who followed him to Center street and north around the corner on the sidewalk where Zoebel had fallen, and arrested him.

On cross-examination Mr. Walters testified that defendant remained in the rear of the Wine House from five to ten minutes. When he first saw Zoebel and defendant scuffling, Zoebel had a ramal in his hand. Witness did not see any blows struck with it. Witness was about 20 or 30 feet away when he saw the ramal in the hands of Zoebel.

Eli Francovich, an employee at the Wine House, who had resided at Reno all his life and who had seen defendant many times, though not personally acquainted with him or Zoebel, testified that while standing at the front of the Wine House, on the inside, two young men came in the front door and he heard one of them saying to the other, "That is him going into the toilet now." Witness looked toward the rear of the building and saw a man entering the toilet, whom he did not at that time recognize. Witness watched and in a few minutes saw defendant coming out. Defendant turned and went out the back door into Douglas alley. Witness testified that no one else had been in the toilet while defendant was there. Witness went out through the back door, saw defendant proceeding east in Douglas alley, followed him, and when he reached the end of the alley, saw the officers searching him.

On cross-examination, Mr. Francovich testified that the toilet was one in general use where anybody could enter who saw fit, and that many men were in and out of that room every day. Defendant was in there not more than two or three minutes. This was around 6: 30 a. m. at the latest.

Fred East, a prospector who had been around Reno a number · of years, and who had previously seen both defendant and deceased, though not personally acquainted with either of· them, saw them scuffling and trying to clinch with each other on the sidewalk about 30 feet north from Douglas alley, about 6 o'clock or maybe a little later. He did not see either one strike the other at first, but a little later, just before Zoebel fell, he saw defendant strike him on the left side of the face. He also saw Zoebel strike defendant over the head two or three times with the whip end of the ramal. Zoebel's blows did not look very hard. "He didn't look like that he was very stout." After defendant had struck Zoebel, the latter grabbed hold of a high iron sign post to steady himself. When he left that post, he reeled quite a bit, did not walk very straight. From that post he went to the side of the Palace Club near the front entrance and there fell. Witness was standing almost opposite the front entrance of the Palace. About this time defendant told witness that Zoebel had been picking on him for the last eight years, "and I have fixed him so that he won't pick on me or anybody else." Defendant referred to Zoebel as a s—— of a b———. . He looked around at Zoebel and said, "You will not bother me any more"; then he turned the corner and went west on Commercial row.

Mr. East testified, on cross-examination, that he did not see state's witness Walters at the scene of the trouble. As Mr. Hill was walking away from Zoebel, the latter hit him over the head two or three times with the ramal. Zoebel was holding the ramal by the loop and was hitting defendant with the straps. Witness did not see the ramal doubled or folded up at any time. Witness was near the front entrance of the Palace Club when he first saw defendant and Zoebel scuffling on the sidewalk about 50 feet to the south. They were about 20 feet south of where witness was standing when Zoebel commenced hitting defendant over the head with the ramal,

and about 10 feet from where witness was standing when he saw Zoebel cut on the face. Defendant was in front of Zoebel coming towards witness. As Zoebel was striking defendant with the ramal, defendant turned around and cut Zoebel's face. After the trouble, witness followed defendant west on Commercial row, but defendant was not in sight when witness turned the corner at Virginia street. Witness proceeded south on Virginia street to Douglas alley, but did not see defendant at first as he looked eastward in that alley. Witness started to cross Douglas alley when he heard a couple of men say, "There he goes." Witness then looked down the alley again and saw defendant crossing to the side of the Bank Club. Defendant walked out of the alley on to Center street and then crossed the alley northwards towards the place where the crowd was standing around Mr. Zoebel.

On redirect examination, Mr. East testified that although he did not see Mr. Walters at the scene of the trouble, he might have been there because there were lots of people around there. Zoebel followed Hill about 40 feet before collapsing on the sidewalk.

Jacob Sands, a resident of Reno for about twenty years, while standing at the front corner of the Palace Club the morning of the trouble, happened to look to the south and saw defendant and Zoebel "kind of wrestling." He thought they were fooling. The next he saw, defendant was walking toward him and Zoebel was "kind of making weak efforts with a sort of strap." As Zoebel came closer, he slumped over. Witness saw Zoebel strike defendant about once or twice, "just kind of weak efforts."

On cross-examination Mr. Sands said that Zoebel was making a few "wild swings," which "kind of glanced off" because defendant was holding up his elbow, trying to ward the blows off a little. Witness did not notice defendant stop at any time. He kept on going, mumbling a little to himself, and proceeded west on Commercial

row. When Zoebel was striking at defendant with the whip, just before collapsing, defendant did not use a knife or strike him with anything. From the place where Zoebel struck defendant the last time, to the front corner of the Palace Club, defendant did not talk to anybody. He was just mumbling a little as he passed witness.

Dr. William L. Howell, who had practiced medicine and surgery in Nevada for twenty years, and was county physician for Washoe County, performed an autopsy to determine the cause of Zoebel's death. This was on the afternoon of the day of the killing. He discovered eight lacerated wounds, some of which were on the scalp, face, neck, and shoulder. One stab wound penetrated the left ventricle of the heart, resulting in a hemorrhage which filled the pericardium. There were other wounds on the body, including one in the abdomen. The cause of death was compression of the heart, resulting from the hemorrhage. It would be possible, said Dr. Howell, for a man stabbed in the heart as Zoebel was, to walk 40 feet before collapsing and dying. Zoebel may have lived some minutes before death ensued. The wound in the heart was caused by a cutting instrument, apparently a sharp one. The knife claimed by the state to have been used in the stabbing would ordinarily be more apt to make the wounds than the smaller knife found in defendant's clothes after the killing. The latter has a shorter blade, and more dull, and not one that could be used with the same force and make the same wounds. Zoebel was an average-sized man, thin, weighing about 160 pounds, at a rough guess. On cross-examination Dr. Howell testified that any of the wounds could have been made by the smaller knife.

Lowell Nugent, funeral director, testified that when he took possession of the body at the hospital, it was clothed, and he assisted in removing the clothing. It was searched, for purposes of identification, and was found to contain some cigarette papers and matches, a

piece of wrapping paper about eight inches wide on which was written, in lead pencil, "I am not at the river," and an ordinary small pocket knife. The blades of this knife were closed. No firearms were found.

Lyle R. Stout, eleven years with Nevada Machinery & Electric Company, seller of electrical merchandise at Reno, testified that in electrical business they use a stranded wire gauge, and that he had had eleven years experience in the use of such gauges. Some of the wire found at defendant's premises was size 19. This wire is soft iron galvanized wire, and is the same size and kind as that with which the blade of the longer knife was wired open. The sharp side cutters used by electricians cut wire clean. Ordinary pliers, not sharp, leave a kind of bend on the end of the wire where it is cut. The wire on the longer knife looked like it might have been cut with some type of gas plier, because the ends were rather rough; not cut sharp and clean; "kind of broken off like something dull." Referring to the wire found at defendant's place, of the same kind and size as that on the knife, witness stated that the ends looked like the wire had been cut with a cheap gas plier such as that found where defendant lived—a plier that bends and pinches the wire instead of cutting it sharp and clean. On cross-examination Mr. Stout testified that the pliers found at defendant's place are a type commonly used all over, and that might be found in pretty nearly any cabin or house in Reno. Any cheap plier would make the same appearance in cutting the wire. Witness would not say that the wire on the knife was cut from the other piece of wire in evidence, but only that it was the same type of wire, and the same size.

Defendant testified that: "He had been living in Reno the last ten years. He quit working in mines when he was sixty-six years old. His health had been bad for several years, because of stomach trouble. He was coming seventy years of age, and weighed 126 pounds. When younger, he weighed 165. For the past year he had been

working on government relief. Prior to May 12 he had been working at the university, at the north end of Reno. He had known Zoebel for about ten years, and saw him occasionally. Defendant left his home about 5:15 on the morning of May 12, 1936. He walked right up town to the Wine House, where he used to go every morning when he was working to take a rest. He left there by the back door about 6:30, and went east in Douglas alley, turning north at Center street. As he turned the corner from the alley on to Center street, he saw Zoebel walking south toward him, about 25 feet away, on the sidewalk along the side of the Palace Club. When they were 3 or 4 feet from each other, Zoebel, without any warning, pulled the ramal from behind his coat and began beating defendant on the head. At that time the ramal looked like a blackjack to defendant. It was doubled up. Defendant thought he was in danger of getting badly hurt, and believed it was necessary to defend himself. The attack came so sudden he was mystified, stunned, did not know what to do. All he had to defend himself with was the penknife, so he pulled that out of his pocket and used it in self-defense, backing away as he did so. The time during which he was cutting Zoebel was about a minute. He was trying to get away, but Zoebel hung right on to him. He had no intention of killing the man and felt sorry because the man was dead. He was never in trouble of this kind before—always tried to keep out of trouble. This was the sixth time Zoebel attacked him in the last eight years. About six years before, when defendant had two broken ribs, Zoebel knocked him down, beat him all over the head and part of the face with a rock. Since then he had attacked defendant on several other occasions, but defendant had escaped without serious injury. About five or six days before the final encounter, Zoebel shook his fist at defendant, and defendant crossed to the other side of the street. It was always Zoebel who commenced the trouble. He was a bigger and stronger man.

Defendant was never looking for trouble. Defendant cleaned the blood from the blade of the penknife with his fingers. He knew nothing whatever about the other knife; never saw it until the preliminary examination. When the trouble happened, defendant had his lunch and was on his way to work. He had no weapons— never did. The penknife was all he had. He did not expect to meet Zoebel there that morning; he was cornered and could not get away. He did the only thing he could do under the circumstances. He was as innocent as a child. As to the blood on the paper: Zoebel tried to get the knife away from him, and defendant cut himself. The scar could be seen yet. He wiped the blood from this wound with that paper. Zoebel tried to knock defendant out before he had time to defend himself, but he held up his left arm to catch the force of the blows.

On cross-examination defendant testified that: Neither he nor Zoebel spoke a word during the encounter, and defendant did not say anything to anybody else, though he may have mumbled or something like that. He did not call Zoebel any names. When he went around to the intersection of Douglas alley and Virginia street, after the trouble, he next proceeded east in that alley, and did not stop except to light a cigarette by the old Louvre Club. He did not go into the Wine House at all after the fight. The paper with which he wiped the blood from his wound had been in his pocket probably for days. Zoebel hit him once, before he raised his arm. The place where he was struck was so sore that he could hardly chew for weeks. He wiped the blood off the knife, and closed it, as he walked west on Commercial row. Regarding the blood on his fingers: "I don't know what became of it, I guess—I don't know as I could explain that." He did not feel it was necessary to kill Zoebel, did not want to kill him, and did not try to do so.

The testimony has been outlined at some length because appellant contends that upon the whole case the evidence was insufficient to support the verdict, and

that the verdict is against law and contrary to the evidence. Before considering this assignment, we shall take up the question whether Mr. Mix's deposition was erroneously admitted in evidence at the trial. Defendant's objections to its admission were, first, that there was insufficient showing that the personal attendance of the witness could not be had (section 10775 N. C. L. 1929, as amended Statutes of Nevada 1933, c. 101, p. 126) ; second, that to admit the deposition would violate his constitutional right to be confronted by the witness against him and would also deprive him of the right to cross-examine the witness.

In State v. Parker, 16 Nev. 79, relied upon by appellant, this court reversed a conviction of burglary because the deposition of a witness at the preliminary examination was erroneously admitted in evidence at the trial. In that case no subpena was issued for the witness, and it was not shown that any effort was made to find him or produce him in court. In the instant case Mr. Mix's name was included with those of the other witnesses for the state, in the subpena which was handed to Deputy Sheriff Charles Young. As Mr. Mix was a printer by trade, Mr. Young went to the Gazette office, the Journal office, and the Reno Printing office, in trying to locate him. He then learned from the secretary of the Printers' Union that Mix had left for Sacramento. He communicated with the secretary of the Sacramento Printers' Union, who wired back that Mix had been there, but had left, probably to go back to Reno. It was on May 28 that Mr. Young started to work to serve the subpenas. He testified that he had been trying to find Mr. Mix every day since that time. He had seen him on several occasions since the trouble happened, around the Wine House, the Bank Club, and in Douglas alley. He tried to find him in that vicinity, the last time being on the night of the first day of the trial, June 15, 1936. He also inquired of various persons with whom he had seen Mix talking, but they did not

seem to know where he was. We think this was a sufficient showing that Mr. Mix's personal attendance could not be had at the trial.

The further objection to the admission of Mr. Mix's deposition at the trial, namely, that it violated defendant's constitutional right to be confronted by the witness Mix and deprived defendant of the right to cross-examine him, is based upon a part of the testimony of James E. Sullivan, committing magistrate, who presided at defendant's preliminary examination. Judge Sullivan, after testifying at the trial as a witness for the state that all the legal formalities prescribed by the statute had been complied with at the preliminary examination, testified, in part, on cross-examination as follows:

"Q. You do know that the defendant was a man apparently unfamiliar with judicial proceedings of that kind? A. Yes.

"Q. And isn't it a fact, Judge, that because of the man's mental and physical condition that he would not be capable of conducting very much of an examination or cross-examination? A. No, I don't believe he could examine or cross-examine very well."

■ It is not contended that defendant was denied or deprived of any rights at the preliminary examination for any reason other than that he was not in such mental and physical condition that he was able to properly cross-examine witnesses had he desired so to do. No authorities have been cited in behalf of appellant on this particular question, but we have, nevertheless, given the question careful consideration. Other than Judge Sullivan's testimony, there is nothing in the record bearing upon the mental or physical condition of the defendant either at the time of the preliminary examination or the trial. The magistrate's testimony was a mere statement of his belief that defendant, at the preliminary examinations, was not in such mental and physical condition as to enable him to examine or cross-examine very well. This is not, in our opinion, sufficient to bring

this case within the rule laid down in Combs v. State, 52 Okl. Cr. 99, 2 P. (2d) 1037, 1038, which presented a situation more similar to that in the instant case than any other authority we have found. In that case the criminal court of appeals reversed a judgment of conviction upon the ground that defendant, who was not represented by counsel at the preliminary examination, was of unsound mind and unable to cross-examine the witnesses or to waive his right to counsel. The conviction in that case was for grand larceny, and the verdict of the jury read as follows: "We, the jury impaneled and sworn in the above - entitled cause, do upon our oaths, find the defendant guilty of grand larceny, and fix his punishment at eighteen months in the penitentiary, and we recommend that he be paroled to any person or institution who will take him in charge and provide whatever operation or medical attention, if any, be necessary." In its opinion the court said: "In the case at bar the evidence is that the defendant was shot in the nose when he was about eleven years of age and some hard substance was lodged in his head, and that since that time he had been at times irrational and mentally incompetent and possessed of a mania for taking the property of other people apparently without any definite purpose or idea of ownership or responsibility. The verdict of the jury practically amounts to a finding of criminal insanity. * * *. If the defendant had been represented by counsel and had an opportunity to cross-examine the witnesses and failed to do so, he could not complain, and the evidence would have been admissible. But the facts in the case at bar are far different to those covered by the general rule, in that defendant was not represented by counsel and in that the whole record, including the verdict of the jury, indicates that he was of unsound mind and unable to cross-examine the witnesses or to waive his right to counsel."

In the case at bar, self-defense was relied upon entirely. The defense was not based wholly or in part on insanity. No suggestion was made at the trial that

defendant was not in a condition to defend himself. There was no testimony tending to show that at the time of the trial in the district court defendant's condition was any better than it was at the time of the preliminary examination. Defendant took the stand at his trial in the district court, and a study of his testimony indicates that at that time he understood very well what evidence would tend to help him as well as what would tend to prejudice his case. It is our opinion that the trial court properly admitted in evidence the deposition of the witness Mix taken at the preliminary examination.

■ When the state offered in evidence the knife with which it claimed the stabbing was done, defendant objected to its being admitted upon the ground that it was incompetent, irrelevant, and immaterial, no sufficient foundation having been laid, or sufficient evidence offered to connect it with the defendant. This objection was overruled, and the knife admitted in evidence. The action of the trial court in so admitting the knife in evidence is assigned by appellant as reversible error. It is clear to us, however, that the district court's ruling on this point was correct. If the witness Mix's testimony were not in the case, the question would be more serious; but Mix's deposition having been, as we have ruled, properly read in evidence at the trial, the action of the trial court in permitting the knife to be admitted in evidence was so clearly right that we do not feel called upon to enter into any discussion concerning it.

Appellant further assigns as error that the evidence was insufficient to support the verdict, and that the verdict is against law and contrary to the evidence. It is appellant's contention that the evidence was insufficient to warrant a conviction of any offense, and that in any event it was insufficient to warrant a conviction of murder of the second degree.

■■ Section 4 of article 6 of the constitution of Nevada gives this court appellate jurisdiction "on questions of law alone in all criminal cases in which the offense charged is within the original jurisdiction of

the district courts." In a criminal case this court will not set aside a verdict of conviction upon the ground of insufficiency of evidence if the verdict is supported by any substantial evidence. We have studied the transcript with much care and have given an outline of it earlier in this opinion. We are satisfied that there was sufficient evidence upon which the jury, as reasonable persons, could properly base the verdict they arrived at in this case. The fatal stabbing was admitted. In his endeavor to raise a reasonable doubt in the minds of the jurors as to whether the killing was in self-defense, defendant gave some testimony which reasonable persons could not be expected to believe. The most flagrant example of such testimony was defendant's denial that he had been in the Wine House at all at any time after the stabbing took place. The purpose of that denial is very patent, namely, to attempt to avoid the effect of the testimony of other witnesses connecting him with the knife which the state contended was used in the killing.

Defendant was the only one who testified that the ramal, while in the hands of Zoebel, was doubled or folded up. Again, on direct examination, defendant testified, "When we were about three or four feet away, he pulls this here blackjack from behind his coat and he started batting me on the head without a moment's notice." On cross-examination, he testified that when he first saw Zoebel coming towards him, he was about 25 or 30 feet from defendant as near as he could judge, and that he was something like half that distance when he drew the whip.

Defendant's own testimony seriously impaired his credibility and placed him in such a position with the members of the jury that they were at liberty to entirely disregard his story, except insofar as it was corroborated by other credible evidence. The jury was not bound to accept defendant's account of the beginning of the trouble on the morning in question, and in this connection it will be remembered that the officer who

arrested defendant did not notice any bruises, scratches, or abrasions on his face. Even if the jurors believed that the whole or some part of defendant's uncorroborated testimony relating to the beginning of the trouble might have been true, their verdict clearly shows that they were convinced beyond a reasonable doubt that defendant did not act as a reasonable man in stabbing Zoebel to death, and that the stabbing was done with the malicious intent to take Zoebel's life. We are clearly of opinion that this court would not be justified in setting aside the verdict of the jury on the ground that there was not sufficient evidence to support it.

The judgment and order appealed from are affirmed.