STATE OF NEVADA, RESPONDENT, v. EUGENE LEO GAMBETTA, APPELLANT.

No. 3549

August 16, 1949.          208 P.2d 1059.

*C. Benson Tapscott,* of Reno, for Appellant.

*Alan Bible,* Attorney General, *Homer Mooney* and *Robert L. McDonald,* Deputy Attorneys General, *Harold O. Taber,* District Attorney, and *Grant L. Bowen,* Assistant District Attorney, Reno, for Respondent.

## OPINION

By the Court, BADT, J.:

Appellant Eugene Leo Gambetta was convicted in the district court of Washoe county for the crime of murder in the first degree and the jury imposed the death penalty. Gambetta has appealed from the judgment and from the order denying his motion for a new trial. Before considering his seven assignments of error a recital of the facts is necessary. These facts appear from three separate confessions made by the defendant to three separate officers in San Francisco immediately following his apprehension and also from certain additional, independent and corroborative evidence adduced at the trial.

Appellant and deceased, Thelma Ribail, were married in January 1945 and lived in an apartment in San Francisco. Following marital difficulties Thelma left appellant in March 1948, and established her residence at the Gibson Apartments in Reno with her sister Lola LaPoint. Defendant made several trips from San Francisco to Reno in efforts to contact his wife, and did contact her on four or more occasions, forcing her at the point of a gun to accompany him in a car. On May 29, 1948, approximately a month and a half before the fatal shooting, deceased, learning of the presence of defendant in Reno, attempted to leave her apartment in a taxicab driven by one Eugene Pettipiece who had been sent by Thelma's sister Lola for the purpose. However, as Thelma was leaving the front entrance of the Gibson Apartments in Pettipiece's taxi, appellant appeared, brandished a chrome plated, shiny revolver, ordered Pettipiece to drive off in his cab, and stated, "I'll blow her guts all over the sidewalk." Pettipiece reported the incident to Lola, who in turn reported it to the police. An hour later defendant was arrested, and the loaded revolver was found in his car. Defendant was fined $50 for violation of a city ordinance in connection with his

possession of the gun and he paid his fine and returned to San Francisco. On June 19 he again returned to Reno, discovered his wife coming out of a night club with another man, followed them to another night club and subsequently drove to her apartment house and waited there until she and her companion arrived about 5:30 in the morning. Defendant states, "* * * I didn't kill him then. I don't know why. I was hot enough. * * * I went downtown and got drunk and went back to kill them and the car was gone." He cached his automatic pistol in a hedge across the street from Thelma's apartment, drove downtown, got drunk, was arrested for colliding with another car and before being released the following morning, was served with divorce papers. On June 23, 1948, at a meeting in the office of his wife's attorney, he expressed bitterness toward his wife and said he should have shot her before. When his wife's attorney suggested that it was lucky that he did not do so, appellant expressed the conviction that no jury would convict him. He did, however, sign an appearance in the divorce action with a waiver of time, etc., as a result of which the deceased obtained her divorce and the restoration of her former name Thelma Ribail. Before returning to San Francisco defendant again cached the automatic in the hedge across the street from the Gibson Apartments. On July 8, 1948, on receiving information that appellant had again returned to Reno, deceased and her sister Lola, with the assistance of the district attorney, filed a complaint with the justice of the peace and again obtained a warrant for defendant's arrest. At that time the sisters agreed that if appellant should "get" either of them she would throw her purse or shoes or something belonging to her away so that if such articles were found the other "would know that Gambetta had her." Both sisters were in constant terror of the defendant.

On July 14, 1948, defendant rented a light-gray Ford sedan in San Francisco and drove to Reno, arriving

about 7:00 p. m., where he first ascertained that the pistol was still in the hedge fully loaded. He unsuccessfully tried to locate his wife that evening and stayed at a motel in Reno. The following day, July 15, at 3:30 or 4:00 in the afternoon he first saw deceased driving a Lincoln sedan with a Nevada license No. 40–998. He followed the car but lost her, and later found the Lincoln sedan parked by her apartment. Later he drove to various clubs trying to locate her and finally saw her coming out of a club or restaurant with another girl and a man. He drove back to her apartment and after waiting for some time, drove off and again met deceased and her male companion leaving another club. He drove back to the apartment, waited till 4:30 a. m., drove downtown again, and again observed deceased and her male companion leaving another club. He again drove back to the apartment and waited for them to return, which they did about 5:00 a. m. Appellant approached them with his gun in his hand, and ordered Thelma's companion to leave, which he did. An argument ensued between appellant and deceased and he struck her between the eyes with the butt of his gun—the gun being discharged in the process but apparently doing no other injury. Two persons heard the shot and fixed the time at 4:55 a. m. The blow from the butt of the gun resulted in a cut one and one-half inches long and about one-third inch deep from which blood flowed and ran into the deceased's eyes and upon her clothes and to the street. Some drops were upon her shoes, which were subsequently found. Appellant forced deceased to get into his car, drove north to Fourth Street and turned east. As they approached Sutro Street deceased stated that she would jump out of the car and appellant said, "If you jump I'll shoot you." She started to jump out and he shot her. He stopped as quickly as he could, backed the car up to where she was, ascertained that she was dead, picked her up and put her on the back seat of his car, turned around and drove around Reno for about an

hour and a half, called again at her apartment for the purpose, as he stated later, of killing the deceased's sister Lola. He was unable to gain entrance, drove south from Reno, turned west on what is known as the Mt. Rose road and stopped in the neighborhood of the Callahan ranch cutoff and transferred the body to the trunk compartment of the car. He then drove to Highway 50 and to San Francisco by way of Placerville, Sacramento and the Golden Gate Bridge and parked on the Great Highway facing the ocean in the vicinity of the Park Commissary where he was arrested about 5:00 p. m. by two officers of the San Francisco Police Department. These officers had received information that Gambetta, in a car bearing California license No. 3L1444, was wanted for investigation of kidnap and murder and that he was armed and dangerous. Defendant readily admitted his name and that deceased's body was in the trunk of the car. The .32 caliber automatic pistol with six cartridges was found on the front seat. During the course of the afternoon appellant frankly made three statements outlining most of the facts substantially as above recited. On July 20, 1948, the district attorney of Washoe county filed an information charging the defendant with murder. He waived his preliminary examination and was arraigned on the same day and entered a plea of not guilty. His trial commenced August 9, 1948, at which time facts as above recited were submitted to the jury. The verdict, finding him guilty of murder of the first degree and fixing his punishment at death was recorded August 13, 1948.

Appellant's first assignment of error arises out of the admission in evidence over his objection of state's Exhibits Nos. 5, 6, 7, 8, 9, 3 and 1. Nos. 5, 6 and 7 were enlarged photographs of the car parked on the Great Highway in San Francisco and in which defendant was sitting at the time of his arrest. Nos. 8 and 9 were enlarged photographs of deceased's body in the trunk compartment. Nos. 3 and 1 were enlarged photographs

of deceased's body at the time of the post-mortem examination in San Francisco.

Appellant's objections to the admission of these exhibits were urged separately as the exhibits were respectively offered. The several objections were not based on the same grounds and did not as a matter of fact embrace all of the grounds now urged by appellant. For the purpose of this opinion, however, we are willing to assume that all of the matters now urged by appellant as error were embraced within the scope of the objections made and the exceptions taken. Appellant urges that no proper foundation was laid for the introduction for any of these exhibits, that there was no showing as to who took or enlarged the photographs, or that the photographs, after their enlargement, or the other exhibits, had been continuously in the possession of any individual, that the exhibits were immaterial, that the photographs were merely cumulative, and that all of the exhibits tended to prejudice and inflame the jury.[1]

██ State's Exhibit No. 5 is an enlargement of a front view photograph of the Ford sedan showing California license No. 3L1444 as the car was parked on the Great Highway in San Francisco. No. 6 is an enlargement of a photograph of the rear view of the same car, also showing the license number, and No. 7 is an enlargement of a side-view photograph of the same car. In the case of these photographs, as in the case of all of the other photographs admitted, a witness testified that he had taken the picture and that it was a fair, correct and

[1]Under the provisions of an act to provide for and to regulate bills of exceptions in criminal cases, etc., stats. 1947, p. 293, chap. 87, a bill of exceptions may consist of a transcript of the proceedings properly certified, "together with all other matters, exhibits, motions, papers, or orders required to be incorporated in a bill of exceptions * * *." Neither the appellant nor the state has seen fit to have the exhibits admitted during the trial certified to this court, or to seek an order of this court requiring the exhibits to be sent up. As all of the exhibits are fully described in the testimony and discussed at length in the briefs of counsel, we deal with the record as we find it.

true representation of the scene it purported to represent, that the photograph was taken by the witness, a San Francisco police photographer, and enlarged by him. Nos. 5, 6 and 7 identified the car in which the state claimed deceased was riding with appellant shortly before the former's death and in which her body was found about twelve hours after her death. The photographs corroborated the statements contained in the three confessions made by appellant, and also corroborated the statement of another state's witness who testified to seeing a light-gray sedan leave the Gibson Apartments in Reno, drive north to Fourth Street and there turn east. The photographs were undoubtedly relevant and material, a sufficient foundation was laid for their admission, and the fact that their exact presence in the hands of any one person was not accounted for until they were offered in evidence did not, in the absence of any adverse showing in the record, destroy their admissibility. 22 C.J.S., Criminal Law, sec. 712, p. 1207; Hill v. State, 58 Nev. 28, 68 P.2d 569; State v. Lewis, 50 Nev. 212, 230, 255 P. 1002; State v. Salgado, 38 Nev. 64, 76, 145 P. 919, 150 P. 764.

Nos. 8 and 9 were enlarged photographs of the body of deceased found in the trunk of defendant's hired Ford sedan at the time of his arrest in San Francisco. A foundation was laid as in the case of the other photographs. These two photographs corroborated the testimony of the officers, served to identify the body, corroborated appellant's confessions and showed that the hat and shoes were missing from the body. Nos. 3 and 1 are enlarged photographs of deceased's body at the time of the post-mortem examination. They were both identified by the San Francisco officer who took and enlarged the photographs. No. 3 is a view taken from the front and above the body. No. 1 was admitted after deceased's sister identified the photograph as that of deceased. Both photographs supported the testimony of the doctor who performed the post-mortem examination. No. 3

showed the location, nature and extent of the wound on deceased's forehead caused by a blow from appellant's pistol some time prior to the fatal shooting. Appellant concedes that No. 1 served to identify the body. The photographs were all admissible for the purposes discussed and in all cases a sufficient foundation was laid. Nothing in the record indicates that the photographs were so gruesome as unduly to inflame, excite or prejudice the jury.

■■ General rules 'as to the admissibility of photographic evidence have been so well established not only by the opinions of many courts of last resort and by the text-writers but also by the decisions of this court that a discussion of such rules with application to the facts of this case is not warranted. State v. Roberts, 28 Nev. 350, 82 P. 100, 103; State v. Holt, 47 Nev. 233, 219 P. 557. In the former case, in answer to the claim that the photographs were gruesome and would inflame and prejudice the jury, to which argument appellant devotes considerable time in this case, this court, speaking through TALBOT, J., says with reference to the photographs admitted in evidence:

"Of the three admitted, one shows the face of the deceased in the repose of death, and in it Conductor La Point was able to recognize the features of the man that was picked up at the end of the ties near Zola in the morning and taken to Winnemucca in the caboose on his train, and the others showed the entrances of the bullets on the arm and leg, and were illustrative and instructive in connection with the testimony of the doctor and other witnesses. If their tendency was to give a more vivid realization of the wounds than a verbal description, they were less gruesome than an exhibition of the man's injuries to the jury in his real flesh and bone, which would have been permissible, if practicable. They had been taken the day after Welsh died, and were not especially repulsive, and there was testimony to the correctness. We are cited to some extreme cases where photographs

were rejected on the grounds that witnesses had described what they would show, or that they would inflame and prejudice the jury—doctrines that we are not able to sanction, and which are not supported by the weight of authority. If juries cannot be intrusted with the pertinent facts for which litigants and offenders are responsible, however appaling they may be, and with the most accurate, instructive, and convincing evidence of those facts, it is time to abolish the jury system. Photography, engraving, and the arts of picture making are important factors in our civilization, and the courts in their search for truth should not be averse to accepting the benefits they bring. A glimpse at a photograph may give a more definite and correct idea of a building or of a person's features than the most minute and detailed testimony. A child may learn more regarding the appearance of an animal it never saw by the sight of its picture than by listening to a lecture or reading a volume of description. When photographs are shown to be correct representations, and give a better and clearer understanding of relevant facts, it would seem on reason and principle that their use as evidence should be favored. It is generally held that they need not be taken by a professional photographer, and that any one who knows may testify regarding their correctness."

Part of the foregoing is quoted in the Holt case where this court, speaking through COLEMAN, J., emphasizes the fact that in this age of general education, wherein people are trained to think, there is little danger that the minds of the jurors will be influenced merely because a bloody garment or similar exhibit is introduced in evidence and exhibited to them.

Appellant relies strongly on State v. Miller, 43 Or. 325, 74 P. 658, 659, in support of his contention that it was error to admit the photographs of the body of deceased. It is true that in that case the introduction of the photographs was held to be error because they "presented a gruesome spectacle of a disfigured and

mangled corpse, very well calculated to arouse indignation with the jury." However, the testimony adduced to support the admissibility of the photographs indicated, also, that the pictures were not faithful reproductions and were partially inaccurate. In a later case the Oregon Supreme Court cited, with apparent approval, severe criticism of the Miller case as expressed by Wigmore and other text writers. State v. Weston, 155 Or. 556, 64 P.2d 536, 108 A.L.R. 1402.

■ Defendant's second assignment of error urges that the admission of Exhibits 10 and 12 over appellant's objection was error. No. 10 was a .32 caliber German automatic pistol and No. 12 comprised the six loaded cartridges that were in the pistol when it was recovered by the San Francisco police. The pistol was found lying in the front seat of the car identified by the testimony of the officers, the confession of the appellant, and by the three photographs of the car. Appellant asserts that the state "failed to establish the whereabouts of the revolver and cartridges from the time of their acquisition [by the police] until introduced in evidence * * *, that it is essentially prerequisite to the introduction of exhibits of this nature in evidence that their continuous possession be shown. Otherwise, there can be no assurance that the exhibit has not been subjected to tampering, distortion or other change." On the contrary the record shows that the officers identified the gun and identified the cartridges they had removed from the gun from markings made thereon. They testified that these items were in the same condition at the time of the trial as when removed from the car. They were in the constant possession of either the San Francisco officers or the Reno officers. The defendant identified the gun as the one used by him to shoot the deceased. Of the six cartridges removed one was in the chamber and five in the magazine. The capacity of the pistol was eight cartridges. One was accidently discharged when appellant struck the deceased on the head with the butt of the pistol, the other was the fatal shot. Failure of scientific

proof that the shot that killed deceased came from this pistol did not destroy the admissibility of these exhibts. Their materiality and relevancy are apparent. See State v. Lewis, 50 Nev. 212, 255 P. 1002; State v. Salgado, 38 Nev. 64, 145 P. 919, 150 P. 764. As to the admissibility of the pistol and the shells, appellant relies on State v. Crawford, 60 Utah 6, 206 P. 717. But in that case gun and shells were held improperly admitted in evidence because they were found over six weeks after the crime charged and were not connected with the defendant other than by their discovery under a dresser in a room occupied by the defendant and another person. The defendant denied ownership of the weapon. Connecting facts so prominently existing in the present case were almost entirely lacking in the Crawford case. Appellant's contentions on this assignment must be considered as dealing with the weight of the evidence rather than with the admissibility of the gun and shells. State v. Salgado, supra; State v. Lewis, supra; State v. Gee Jon, 46 Nev. 418, 211 P. 676, 217 P. 587, 30 A.L.R. 1443.

■ Appellant's third specification of error concerns the admission of Exhibits 13, 14 and 15, being respectively the purse, shoes and hat found in the street near the Gibson Apartments in Reno. We have heretofore mentioned the state of terror of the deceased and her sister and the agreement made by them for disposition of some article where it could be found in the event of some hostile act on the part of appellant. The articles were identified as those worn by the deceased when last seen alive some hours before her death. The photographs of her body in the trunk of the car showed the absence of these items. They were properly identified and connected up and were properly admitted. The bloodstains on the shoes corroborated the defendant's statement as to his striking the deceased on the head with the pistol and as to the blood that flowed from this wound. While their weight as evidence might be subject to attack, their admissibility is clear.

■ Appellant's fourth assignment asserts error in

the admission of the state's Exhibits 4, 17 and 18, being, respectively, the deceased's bloodstained brassiere with a bullet hole through it, and the shirt and trousers worn by defendant at the time of his arrest and which also bore bloodstains. The brassiere was identified by the physician who performed the autopsy as the one removed from deceased's body. It indicated the point of the exit of the bullet. The blood on the brassiere was of the same type as that of the deceased and of the same type as that found on the shirt and trousers of the defendant and on the street where deceased was first wounded by the blow on the head. The testimony showed that these items were in the same condition at the time of the trial as when they were recovered. The shirt and trousers were the ones worn by appellant at the time of his arrest and at the time of the events preceding it. There was nothing so gruesome in any of these three exhibits to prevent their submission to the jury.

■ Specification No. 5 asserts error in the admission of evidence as to three separate confessions made by appellant. The first was to Officer Burke of the San Francisco police force immediately following defendant's arrest near the ocean beach at San Francisco. The second was made to Officer Murray of the same department while enroute in the police car from the beach to the city hall in San Francisco. The third was made to an inspector of the same department and to other police officers at the city hall some two hours after the arrest. It is asserted with reference to each of these confessions that no proper foundation was laid in that the defendant was not informed on each occasion that what he said might be used against him. The record shows that in connection with the statements made by appellant (the first two were narrative in form and the third was by way of question and answer) no force or threats of any kind were used nor was any promise or offer of reward of any kind made or any compulsion of any sort used. All statements made by the appellant were made voluntarily and he "appeared to be very willing to talk."

Appellant, in this assignment of error, relies entirely upon the absence from the record of any showing that appellant was advised that it was unnecessary for him to make a statement and that anything he said might be used against him. The law in this state, however, is contrary to his contention. State v. Mircovich, 35 Nev. 485, 488, 130 P. 765, 766. The precise point was there raised and this court said:

"It is contended that the court erred in admitting certain statements and admissions in the nature of confession made by defendant to certain officers in Nye county shortly after the assault and while he was in custody. The proof shows that these statements were made voluntarily by the defendant, and without the use of force, threats, inducements, or promises, or hope of reward; but there is no showing that, previous to making such statements, the officers having defendant in custody informed him that, if he made any statements, they might be used against him. This assignment of error is without merit, as there is no statute in this state, as there is in a few states, forbidding the admission of a confession made by a defendant in custody, unless it appears that he was warned that what he should say might be used against him. Cyc. Vol. 12, p. 463, treating this question, says: 'The fact that a voluntary confession is made without the accused having been cautioned or warned that it might be used against him does not render it incompetent, unless a statute invalidates a confession made where the accused is not first cautioned. In Texas, by statute, a confession made by a prisoner while in custody is inadmissible, unless he was warned that what he should say might be used against him; and there are similar provisions in other states. It is not the duty of a police officer, in the absence of a statute, to caution a prisoner as to the consequences of making a statement, if the statement is voluntary, but merely to refrain from inducing him to make a statement.' "

In view of the foregoing, citation of authority from

other states is unnecessary, but we may note that our examination of other authorities indicates that the rule thus expressed in the Mircovich case is supported by the great weight of authority.

Appellant's sixth specification cites as error certain remarks of the district attorney in his closing argument to the jury. The argument attacked is as follows—the italicized portion being claimed to be a violation of our statute prohibiting a special instruction relative to a defendant's failure to testify:[2]

"Now, in a way, I like circumstantial cases. If I had five eye witnesses at the intersection of Island Avenue and Virginia Street, and I could arrange for an automobile collision, I might get five different versions of that automobile collision. One person would describe how the car came into the intersection, and how the cars collided, differently from the next, and so on down the line, but fortunately in this case *there isn't any conflicting testimony, absolutely no conflict in the evidence, nor is there any denial of any of the testimony that has been produced here. It all stands uncontradicted and undenied.* Everything that has been produced here is an established fact."

It should first be noted that we have heretofore held that the express prohibition of a charge to a jury relative to the failure of the defendant to testify (with the exception noted) impliedly prohibits the state's attorney from commenting on such failure in his argument to the jury. State v. Clarke, 48 Nev. 134, 228 P. 582. In that case, however, as well as in State v. Harrington, 12 Nev. 125, quoting with approval from the opinion in Clinton v. State, 56 Fla. 57, 47 So. 389, statements like the above were held not to violate the statu-

---

[2] "No instruction shall be given relative to the failure of the person charged with the commission of crime or offense to testify, except, upon the request of the person so charged, the court shall instruct the jury that, in accordance with a right guaranteed by the constitution, no person can be compelled, in a criminal action, to be a witness against himself." N.C.L., sec. 10960.

tory prohibition. See, also, State v. Williams, 35 Nev. 276, 129 P. 317; State v. Tecope, 54 Nev. 308, 15 P.2d 677. In view of these holdings it becomes unnecessary to discuss the authorities from other jurisdictions advanced by appellant. In virtually all of such cases, however, the impropriety of such statements arose by reason of the special circumstances of the case whereunder the remarks could not be considered other than a direct reference, or a reference by innuendo, to the defendant's failure to take the stand.

Appellant's seventh and last assignment of error is the trial court's denial of defendant's motion for new trial. This assignment embraces the errors asserted under assignments 1 to 6, inclusive, and in addition that the verdict is not supported by the evidence and is contrary to law and to instructions given the jury, particularly instruction No. 18. As to the asserted insufficiency of the evidence, we may repeat what this court said in State v. White, 52 Nev. 235, 285 P. 503, 507: "The facts established were of sufficient probative force to support the verdict, and consequently our inquiry can go no further as to the ground urged. Nothing is better settled by the decisions of this state than that this court is without jurisdiction to disturb a verdict in a criminal case on the ground that it is contrary to the evidence when there is substantial evidence to support it. The corpus delicti may be established by circumstantial evidence. State v. Cardelli, 19 Nev. 319, 10 P. 433."

Appellant concedes that instruction 18 was proper. Indeed, it was given at his request. It reads as follows: "The corpus delicti in a criminal action cannot lawfully be established solely by evidence of a confession, or of an admission, or of both, made by the defendant on an occasion or occasions other than while appearing as a witness in this trial or solely by evidence of any number of such confessions and admissions."

Appellant insists, however, that the verdict is contrary to this instruction in that the corpus delicti

was not proved other than through the confessions of the defendant. This contention attempts to find support in a carefully prepared treatise on the subject of proof of the corpus delicti, and while we commend counsel for his zeal, it adds up to nothing more than the contention that corroboration must be found elsewhere in the record. As we have seen from State v. White, supra, the corpus delicti may be established by circumstantial evidence, and we are unable to accept appellant's contention that "the evidence offered by the state in the case at bar, aside from the purported confession, is insufficient to prove the corpus delicti." The presence of deceased's body in the trunk of defendant's car, the proof of a death wound that could not have been accounted for by accident or suicide, the testimony of the physician performing the autopsy, the exhibits received in evidence and the other facts hereinabove recited, constitute ample proof of the corpus delicti independently of, as well as in corroboration of, the voluntary statements of the defendant. Although most authorities have been careful to avoid a definite rule as to the extent of proof required for this purpose independently of the confession of the defendant, we have no hesitancy in finding it ample in the instant case. In re Kelly, 28 Nev. 491, 83 P. 223; State v. Plunkett, 62 Nev. 258, 265, 149 P.2d 101, 142 P.2d 893; State v. Tramner, 39 Nev. 142, 154 P. 80. We find it unnecessary to discuss the numerous cases discussed by appellant. They either frankly concede the rule as followed in this state, as discussed in the Kelly case, or are readily distinguishable from the instant case. Appellant claims that there is an entire lack of showing with reference to the movements or activities of the defendant between 5:00 p. m. on July 14 to the same hour on July 16 when he was arrested in San Francisco and that no evidence either direct or indirect indicated his presence in Washoe County, Nevada, during this crucial period. Appellant suggests many things that could or might have been proved to supply this lack—

witnesses who saw defendant in Washoe county during this period, defendant's staying at an auto court in Reno the evening of July 14, the passing of the Nevada-California checking station by defendant's car on the early morning of July 16, speedometer readings on defendant's car showing the trip from San Francisco to Reno and return, fingerprints on the car or the gun, testimony of such an unusual occurrence as a woman leaping from a speeding automobile, accompanied by a pistol shot, at 6:00 in the morning when considerable traffic might be expected, bloodstains on Fourth Street where the deceased was shot, ballistic tests of the bullet that passed through deceased's body, proof that the pistol had been recently fired, etc. But without proof of these things the jury, under a proper instruction of the court, apparently found the evidence sufficient. First we may note that the question of venue has not been raised as an assignment of error. We may next observe that while the testimony, aliunde the confessions, is entirely circumstantial, there were numerous items that the jury had the opportunity and the right to consider. Although the companion of the deceased could not identify the man by whom he was accosted at the time the witness was returning deceased to her apartment in Reno at 5:00 a. m. the day of the shooting, his story of the occurrence most accurately corroborates the statement of the meeting as made by the defendant. Defendant's identification of the Lincoln automobile and the exact Nevada license number thereof is a further corroboration. It is hardly conceivable that he could have known the license number unless he had seen and remembered it. He testified to his accuracy in remembering items of that kind. The wound on deceased's forehead and the description thereof by the autopsy physician, the hearing by two witnesses of the shot that accidently resulted from this blow, the blood on the deceased's shoes and on the sidewalk where this blow was struck, the testimony by the witness who saw a gray sedan parked

in front of the Gibson Apartments and who heard an argument between a man and woman, followed by the departure of the gray sedan north to Fourth Street, and thence east, the number of hours that had elapsed between the death of deceased and the discovery of her body as estimated by the physician, the last known presence of the deceased in Reno and the discovery of her body twelve hours later in the trunk of defendant's car in San Francisco, the prior threats of defendant against the life of the deceased, the deadly fear in which deceased and her sister held defendant by reason of these threats and by reason of his prior relations with her on his several trips to Reno—all of these things, besides other matters in the record, were apparently considered by the jury. Every one of these detached items fitted in completely with the defendant's confessions.

This court has often referred to the provisions of N.C.L., sec. 11266, which reads as follows:

"No judgment shall be set aside, or new trial granted, in any case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error as to any matter or pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice, or has actually prejudiced the defendant, in respect to a substantial right."

We have made a most careful examination of the entire record and of all of the assignments of error and of the briefs and oral arguments of counsel, and we find no prejudicial error.

The judgment and the order denying a new trial are hereby affirmed, and the district court is directed to make the proper order for the carrying into effect by the warden of the state prison of the judgment rendered.

HORSEY, C. J., and EATHER, J., concur.

ON PETITION FOR REHEARING

September 26, 1949.

*Per Curiam:*

Rehearing denied.