THOMAS LEE BEAN, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 4669

January 22, 1965                398 P.2d 251

[Rehearing denied February 17, 1965]

*Leslie M. Fry* and *L. Mack Fry,* of Reno, for Appellant.

*Harvey Dickerson,* Attorney General, Carson City; *William J. Raggio,* District Attorney, Washoe County, Reno, and *R. Gaynor Berry,* Deputy District Attorney, for Respondent.

# OPINION

By the Court, THOMPSON, J.:

This appeal is from a conviction of first degree murder and the sentence of death. On April 5, 1963, Tom Bean, then 18 years old, entered the apartment of Sonja McCaskie and killed her. He had never seen her before. The circumstances of the crime were unbelievably ghastly. Death was caused by strangulation. The victim had been raped, her body mutilated, dismembered and placed in a wooden chest. The following day. Bean pawned a camera which he had stolen from Miss McCaskie's apartment. This led to his apprehension on April 13, 1963. When taken into custody he confessed voluntarily and in detail. He did not request counsel, nor was he advised of his right to remain silent. On April 24, 1963, with the advice of counsel of his choice, he waived a preliminary hearing. Five days later the state, by information, charged him with murder. When arraigned, he pleaded not guilty. His defense was insanity. Before trial, defense counsel sought a court order authorizing him to employ, at public expense, two psychiatrists, to examine Bean and testify on his behalf. The court authorized up to $500 "to enable the defendant to obtain the services of a qualified forensic psychiatrist of his own selection for the purpose of

examining and offering testimony on behalf of the defendant." Doctor David Wilson was selected and employed for that purpose.

Subsequently a trial jury was obtained. Though it is a matter of common knowledge that the homicide had received extensive local publicity, Bean did not seek a change of venue. The case proceeded to trial. Substantial evidence of Bean's guilt was introduced, apart from his confessions of guilt. Defense counsel did not object to the transcribed confessions which Bean had given, first at the police station following his arrest, and later on the same day at the crime scene. Indeed, following the testimony of the police officer who related the confession which Bean had given at the police station, defense counsel requested that the recorded transcript of that confession be introduced in evidence, and this was done. The confessions described, with particularity, the bizarre crime. Objection was not made to the introduction of exhibits that were particularly horrifying— enlarged (16" x 20") colored photographs of the victim, showing her mutilated and dismembered body. After the state had completed its case in chief, the defense offered two witnesses, the psychiatrist Wilson who opined that Bean was insane under the M'Naghten test, and a newspaper reporter whose testimony does not relate to the issues of this appeal. Bean did not testify. In rebuttal the state offered the testimony of two psychiatrists, Doctors Rappaport and Toller, who said that Bean was not insane under the M'Naghten standard when he killed Sonja McCaskie. The jury found Bean guilty of first degree murder, and specified the penalty of death. This appeal followed.[1] Additional facts will be mentioned as the assignments of error are separately discussed.

1. *Federal Constitutional Rights.* The underlying theme of this appeal is that Bean was not accorded a fair trial as required by the federal constitution. Particular emphasis is placed upon the recent expression

---

[1]Defendant's trial counsel died while this appeal was pending and before any briefs were written. We appointed counsel to complete the appeal.

of the United States Supreme Court in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, dealing with the Sixth Amendment right to counsel. An effort is made to bring this case within the sweep of Escobedo. The holding of that case is carefully delineated and precisely stated. It is: "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogation that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainright, 372 U.S. 335 at 342, 83 S.Ct. 792, 9 L.Ed.2d 799, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." Each of the factors specified must occur to make that case a controlling precedent. Here it is true that the investigation had begun to focus upon Bean; that he had been taken into police custody; that the police were about to commence a process of interrogation to elicit incriminating statements, and did so; that Bean was not warned of his absolute constitutional right to remain silent. However, Bean did not request counsel, nor was he denied the assistance of counsel. Absent such a request, and denial of counsel, the rule of Escobedo does not apply. The suggestion is advanced that the testimony of a police officer given during the state's case in chief, reflects a request for counsel. That testimony is: "Q. All right. Then what occurred next? A. We took him in the front of the building, and again we headed toward Chief Broadhead's office and into the office, and we placed Mr. Bean in a chair. Q. All right. What occurred then? A. Well, the District Attorney was there, our Assistant Chief was there, among other people, officers. I don't recall just how many or who they were. And Tom Bean

asked me one time, while he was sitting in the chair in Chief Broadhead's office, 'May I ask you a question, sir?' And I said, 'Yes, Tom, go ahead.' And he said, 'Have you ever been in a position where you have asked for help and no one helped you?' Q. All right, and then what happened after that? Was there other conversation? A. No, that is the last conversation that I had with Tom Bean or the conversation I recall. Q. All right. And then what was done with Bean at that time? A. At that time our Assistant Chief and the District Attorney and others took over."[2]

Bean's question to the officer is not a request for the assistance of counsel. It is merely the recitation of a past event, the circumstances of which are unknown. The doctrine of Escobedo does not rule this case.[3]

The appellant also directs our attention to Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and People v. Dorado, 40 Cal.Rptr. 264, 394 P.2d 952. In Massiah, the right to counsel was extended to an indicted defendant under interrogation by the police, and it held inadmissible his admissions of guilt made to the officers during such interrogation. Massiah is not in point with this case. Bean had counsel when a formal charge was filed against him. In Morford v. State, 80 Nev. 438, 395 P.2d 861, we discussed the Dorado case, pointing out that it is an extension of the rule announced in Escobedo, and chose not to follow it.

Having determined that Bean's Sixth Amendment right to counsel was not violated, we turn to discuss briefly the Fifth Amendment privilege against self incrimination. In Malloy v. Hogan, 373 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, the United States Supreme Court held that the Fifth Amendment privilege against self incrimination is applicable to the states through the

[2]The interrogation by the district attorney and the assistant chief then commenced. The transcription of it does not show a request for counsel and a denial.

[3]The high court handed down Escobedo after Bean was tried, convicted and sentenced and while this appeal was pending. Were the Escobedo rule applicable we would then have to decide whether it has retrospective effect. However, we do not reach this question.

Fourteenth Amendment. The American system of criminal prosecution is accusatorial, not inquisitorial, and the Fifth Amendment privilege is its essential mainstay. Federal standards are to be applied to determine whether the privilege has been transgressed. We have mentioned that Bean gave two confessions. Each was transcribed and received in evidence without objection. The first was given at the police station following his arrest. Later, the same day, he accompanied law enforcement officers to the crime scene and explained in detail the sequence of his actions in the McCaskie apartment on April 5, 1963. No promise was made or inducement offered for his statements. He was not intimidated. Trickery was not practiced. No improper influence was brought to bear. However, it is the fact that he was not advised of his absolute right to remain silent. Because of this omission alone, it is argued that his Fifth Amendment privilege was violated. We do not agree. In testing the voluntariness of a confession this fact is but one of many to be considered. Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815. The totality of the circumstances must be examined. Bean was 18 years old, of average intelligence (though a retarded reader), and not unfamiliar with criminal processes. He had been arrested before. He had lived at the State Reformatory near Elko, Nevada. After he had been fingerprinted and footprinted at the police station he bolted and ran out the front door. Police officers gave chase. Some shots were fired. Bean was caught, and he asked, "Who was shooting at me? Why didn't they hit me?" When he was returned to the police station, while in the presence of the district attorney and the assistant chief, and just before their interrogation commenced, he said, "Why didn't he shoot to kill me? I just wished you would have killed me." As we read the recorded confessions, in the light of what had previously occurred, Bean wanted to talk. Indeed, before the interrogation was commenced, Bean said, "Yes, I knew I was nailed when I first come in. I knew that when they took my footprints." Thereafter he answered all inquiries freely and apparently in the spirit of complete cooperation. In such circumstances we cannot conclude that the failure to

warn Bean of his right to remain silent somehow made his otherwise voluntary utterances constitutionally inadmissible on trial. State v. Gambetta, 66 Nev. 317, 208 P.2d 1059. Federal standards do not dictate a different conclusion. Powers v. United States, 223 U.S. 303, 32 S.Ct. 281, 56 L.Ed. 448; Turner v. United States, 4 Cir., 222 F.2d 926; Annot., 1 L.Ed.2d 1735.

Then, too, there is an additional factor present here which sets this case apart from others mentioned herein. As already noted, the defense was insanity. Defense counsel did not object to the introduction of the transcribed confessions, nor to testimony about them. Neither did he object to the enlarged colored photographs portraying horror.[4] It may well have been defense counsel's belief that the confessions and the colored photographs were the best evidence, the most persuasive evidence of Bean's insanity. We do not know. However, it is our view that the defense of insanity casts a different complexion upon the trial than is the case where such a defense is not asserted. Accordingly, the assertions that his Fifth and Sixth Amendment rights were transgressed, must be evaluated with the absence of objection and with this defense in mind. To put it differently, had these rights been ignored in fact (we have held that they were not), still the failure to object on constitutional grounds in view of the insanity defense, would present an entirely different question than is involved in any of the cases heretofore discussed. It is seldom wise for an appellate court to "second guess" competent trial counsel.

Finally, the thought is offered that the total atmosphere surrounding this crime, waiver of a preliminary hearing, the pre-trial publicity, the failure to request a change of venue, the absence of objection to horrifying evidence, together with the matters already discussed, inevitably lead to the conclusion that due process was denied Bean. We cannot construct a denial of due process out of thin air. The pre-trial publicity is no part of

---

[4]We do not intimate any view as to the admissibility of the colored photographs had objection been interposed.

the record on appeal. Trial counsel was selected by the accused, and a preliminary hearing waived. Counsel was apparently satisfied with the jury selected following voir dire (cf. Hanley v. State, 80 Nev. 248, 391 P.2d 865, and the cases therein cited), for he did not seek to change the place of trial. The failure to object to certain items of evidence must have been by choice, for trial counsel was a competent lawyer of experience. Indeed, the matter of his competency is not questioned directly by Bean's counsel on appeal. We hold, therefore, that the record before us does not reflect a denial of due process under either the state or federal constitution.

2. *Re Failure to Tell Jury the Consequences of Not Guilty by Reason of Insanity.* Relying upon our opinion in Kuk v. State, 80 Nev. 291, 392 P.2d 630, Bean claims that prejudicial error resulted from the trial court's refusal to give his proposed instruction dealing with the consequences of a verdict of not guilty by reason of insanity. The requested instruction embodied the language of NRS 175.445 and stated the law. In Kuk the instruction was given. We held that it was not error to give it. In addition we said, "We think that the jury should know the consequences of such a verdict." Bean stresses the quoted language and urges prejudice to a substantial right.

The proposed instruction should have been given, and error occurred when the court refused to do so. However, it does not automatically follow that the error is of such magnitude as to require reversal. NRS 169.110[5] invests this court with a discretion to evaluate error. Some of the standards of evaluation are discussed in Garner v. State, 78 Nev. 366, 374 P.2d 525, and will not

---

[5]NRS 169.110 reads, "No judgment shall be set aside, or new trial granted, in any case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error as to any matter or pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice, or has actually prejudiced the defendant, in respect to a substantial right."

be repeated here. Seldom is a conviction reversed for the failure to give an instruction, the substance of which is made known to the jury in other ways. Had the instruction been given, the jury would have been advised that Bean, if adjudged insane, would be confined in the Nevada State Hospital until regularly discharged in accordance with law. Defense counsel's jury summation, in substance, supplied the same information. Indeed, the central thought of his argument was that Bean should be placed in a mental institution. Among other statements he said, "Ladies and gentlemen, Tom Bean needs help. He is, himself, a sick boy, but we need help more than he does, and the only way we are going to be able to help ourselves is by placing Tom in an institution where he can be studied and examined, and restudied and reexamined until perhaps the day will come that we can anticipate in little kids that they may someday become murderers and prevent it before it happens and not put them away after it happens.

"If you, by your verdict, kill Tom Bean, we haven't learned anything, and we have spent a lot of money, and we are not going to bring back Sonja McCaskie.

"But, if by your verdict you declare him to be insane, then we at least are in a position where we can study him and can learn from him and maybe save a lot of other Sonja McCaskies."

Counsel's jury summation minimizes the error to a point where we cannot find that it resulted in a miscarriage of justice or to have prejudiced the defendant in respect to a substantial right. It was harmless.

3. *Items of Evidence.* Over the objection of irrelevancy, the trial court permitted the state to introduce in evidence a rifle, pistol and holster, and some cartridges owned by Bean and found in his car. None was relevant to an issue in the case, and the objection was good. The victim was killed by strangulation. A garrote which Bean had fashioned was employed to accomplish death. He also used a butcher knife to stab and carve the victim's body. The charge was murder by "strangling and stabbing." The words of Justice Traynor in

People v. Riser, 47 Cal.2d 566, 305 P.2d 1, apply here. He wrote, "When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." Accord: People v. Zachowitz, 254 N.Y. 192, 172 N.E. 466. However, it is inconceivable that the erroneous reception of the mentioned items had any bearing upon the jury's verdict in this case. The mass of relevant evidence establishing guilt deadens the effect of these unrelated items—and, as to the rifle, testimony had already been received through Bean's confession. The error was harmless.

4. *The Prosecutor's Remarks About Parole and Clemency.* In his closing argument to the jury the prosecutor referred to parole and clemency. The reference is assigned as error. His statement was, "The instruction that you can find him guilty of murder in the first degree and sentence him to life, with or without possibility of parole, means just that, simply that parole means parole. It doesn't mean and it doesn't include other clemency which may be afforded."

Nevada law requires that the jury, in a murder case, designate by its verdict the degree of murder, and fix the penalty. NRS 200.030. Appropriate forms of verdict are given the jury to enable it to carry out the statutory mandate. The prosecutor's comment was merely a reference to one of the forms of verdict which the jury, by law, was obliged to consider. The comment was not inaccurate. It was not misleading, nor did it enlarge upon the matter of parole, the requirements for eligibility, how the scheme works, etc. Accordingly, we find no impropriety in a mere reference to parole and clemency in a capital case. We are aware that remarks about that subject may get out of hand and sometimes result in prejudice. This did not occur here. The problem is discussed in the following authorities: Shoemaker v. State, 228 Md. 462, 180 A.2d 682; Sullivan v. State, 47 Ariz. 224, 55 P.2d 312; People v. Linden, 52 Cal.2d 1,

338 P.2d 397 (result change by Cal. Penal Code); McLendon v. State, 205 Ga. 55, 52 S.E.2d 294; comment 15 Stanford L.Rev. 349. Of related interest see Annot., 35 A.L.R.2d 769, entitled, "Procedure to be followed where jury requests information as to possibility of pardon or parole from sentence imposed"; State v. White, 27 N.J. 158, 142 A.2d 65; People v. Morse, 36 Cal.Reptr. 201, 388 P.2d 33.

5. The remaining assignments of error may be disposed of summarily. (a) We are asked to repudiate the M'Naghten test of insanity and substitute another. Though aware that the standard is the subject of an extensive assault by medical authority, we are not yet persuaded that either medical science or the law has fashioned a preferable guide for trial purposes. Hence, we adhere to the doctrine originally announced in State v. Lewis, 20 Nev. 333, 22 P. 241, reaffirmed in Sollars v. State, 73 Nev. 248, 316 P.2d 917, and recently reiterated in Kuk v. State, 80 Nev. 291, 392 P.2d 630. See also People v. Quicke, 37 Cal.Rptr. 617, 390 P.2d 393 (1964), expressing a similar view by the California court.

(b) During summation the prosecutor made certain "I believe" statements. No objection was interposed. Though it is preferable to argue objectively rather than subjectively, the oversight was without significance in the context of this case. Objection must be made if this type of argument is to merit serious consideration on review. The same is true of the prosecutor's statement, "There is only one person in the courtroom today that can tell us that is so." No objection was made. If the comment is considered as an indirect reference to Bean's failure to testify, it was within permissible limits. State v. Clarke, 48 Nev. 134, 228 P. 582; State v. Gambetta, 66 Nev. 317, 208 P.2d 1059.

(c) Finally, it is contended that reversible error occurred because the jurors were not kept together, in charge of a proper officer, for the duration of the trial.

NRS 175.320.[6] The contention has no merit. Neither side requested that the jurors be kept together, rather than allowed to separate during recesses, nor does the record reflect any support for the claim that the verdict may have been influenced because of their separation during recesses. Absent a request pursuant to NRS 175.320, or some affirmative showing of prejudice, this court cannot interfere. Cf. Sollars v. State, 73 Nev. 343, 319 P.2d 139, Annot., 21 A.L.R.2d 1088.

Appellant's counsel was appointed to prosecute this appeal. We commend him for his service and for his manner of presenting the cause to us. We direct the lower court to give him the certificate specified in subsection 3 of NRS 7.260, to enable him to receive compensation for his services on appeal.

Finding no prejudicial error, the judgment and sentence below is affirmed.

MCNAMEE, C. J., and BADT, J., concur.

---

[6]NRS 175.320 invests the trial court with discretion. It reads, "The jurors sworn to try a criminal action may, at any time before the submission of the case to the jury, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer. The officer must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to them or communicate with them, nor to do so himself, on any subject connected with the trial, and to return them into court at the next meeting thereof."