MILTON NORRIS BEASLEY, APPELLANT, *v.* STATE OF NEVADA, RESPONDENT.

No. 4816

August 18, 1965                                    404 P.2d 911

*Robert Santa Cruz, Singleton and De Lanoy,* and *Rex A. Jemison,* of Las Vegas, for Appellant.

*Harvey Dickerson,* Attorney General; *Edward G. Marshall,* District Attorney, for Respondent.

## OPINION

By the Court, COLLINS, D. J.:

This is an appeal from a conviction of first degree murder, for which appellant was sentenced to life imprisonment without possibility of parole.

William T. Green, the victim, was an informer for the Narcotics Division, United States Treasury Department. He was shot and killed at approximately 9:30 p.m., August 11, 1961, in his automobile parked in the 1500 block of North C Street, Las Vegas, Nevada. Green, as an informer, had purchased narcotics from persons known as Harris, Patterson, and Valrie, and except for his death, would have been a witness against them in a pending trial.

By information, appellant Beasley, one Black, Harris, Patterson, and Valrie were charged with the murder of Green and for conspiracy to commit the murder. Black was dismissed as a defendant. Patterson pleaded guilty to second degree murder, leaving appellant, Harris and Valrie to be tried. Appellant Beasley's motion for a separate trial was granted. Harris and Valrie proceeded to

trial which resulted in a "hung jury." They were retried and acquitted.

Appellant cites eleven prejudicial errors occurring during the trial and asks either a new trial or a reversal of the conviction and discharge of the defendant.

The errors alleged are:

1. Judge Mowbray erred in overruling the order of Judge Sexton which ordered that a copy of the transcript of prior proceedings be prepared at county expense for the defendant prior to the start of trial.

2. The Court erred in permitting Ron E. Davis to express an opinion as to the time the defendant's fingerprints were placed upon the victim's automobile.

3. The Court erred in permitting Lt. Handlon to testify as to oral admissions of the defendant while the defendant was illegally detained and deprived of the right of counsel.

4. The Court erred in permitting Ruby Talley to testify as to hearsay statements of Vase Valrie.

5. The Court erred in not permitting defense counsel to inquire as to how long certain prosecution witnesses had been addicted to heroin.

6. The Court erred in permitting DeWayne Wolfer to testify at great length as to the kind of .25 caliber pistol which was used in the crime.

7. The Court erred in permitting Leonard Eagle to testify as to a purchase of an automobile by the defendant after the commission of the crime.

8. The Court erred in withdrawing Instruction No. 27 after argument to the jury and giving in its place an instruction which failed to admonish the jury that no inference of guilt be drawn from the silence of the defendant.

9. The defendant was deprived of due process by reason of the failure of the Court to speedily appoint an attorney following arrest.

10. The defendant suffered an unconstitutional infringement upon his right to remain silent.

11. There was insufficient legally admissible evidence to support a conviction.

Certain of these errors are prejudicial requiring a

reversal and retrial. They will be discussed in the order appearing above.

1. At the commencement of the trial on February 3, 1964, Judge Mowbray denied appellant's motion for continuance. The motion was based on failure to comply with an order of Judge Sexton, entered December 13, 1963, that appellant be supplied with a copy of the transcript of the trial of Harris and Valrie. Appellant had previously been determined indigent. He was originally to have been tried jointly with Harris and Valrie but had secured a severance order that he be tried separately. The issues and witnesses in the two trials were substantially the same.

Judge Sexton had jurisdiction to enter his order. Failure to supply the transcript or continue the trial until it was furnished is prejudicial error. This Court has previously passed upon the point. Marshall v. District Court, 80 Nev. 478, 396 P.2d 680. This result is compelled by the principle announced in Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891.

2. Ron E. Davis, a witness for the State, was permitted to express an opinion to the jury that he found several finger prints and one palm print of appellant Beasley on the victim's automobile. He was also allowed, over objection, to express an opinion as to the time these prints were placed there. The latter ruling is claimed to be prejudicial error.

The evidence clearly established witness to be an expert in lifting, identifying and comparing finger prints. The trial court was entitled to allow him to express an opinion as to the finger and palm prints of appellant found on the automobile. He should not, however, have been allowed to express his opinion as to the time they were placed there.

In order for an expert finger print witness to express an opinion as to when finger prints were placed on a given object, a "control test" must first be conducted. In a "control test" a series of latent finger prints are

placed on a surface and controls are placed on all governing factors such as air, humidity, dust, and heat in order to determine how long the prints would remain on a given surface and could be dusted out. Similarly, other factors such as the oiliness of the skin of the fingers and palms, physical condition of the skin of the person making the impression, surface of the object touched, heat and other obscuring factors have an effect on the time they were placed there. The witness admitted on voir dire examination he had not conducted a control test and in order to state "positively" as to the time a print was placed on a given object he would have to conduct it.

There are limits to opinions an expert may be allowed to testify. Section 780, 20 Am.Jur., Evidence, at 651, states these limits:

". . . Furthermore, the facts on which an expert opinion is based must permit of reasonably certain deductions as distinguished from mere conjectures. Notwithstanding a tendency toward the extension of the field of admissibility of expert testimony which is based upon established or generally recognized scientific principles or discoveries, it is essential that the principle or discovery from which a deduction is to be made shall have been sufficiently established to have gained general acceptance in its particular field of science."

This Court ruled in Levine v. Remolif, 80 Nev. 168, 390 P.2d 718, 720, that an expert witness may not give an opinion if ". . . his conclusions to a substantial degree were a result of guess work." The identical circumstance is present here when Ron E. Davis was allowed to express an opinion as to the time appellant's finger and palm prints were placed on Green's automobile. To allow him to so testify was prejudicial error.

3. Appellant urges that error was committed when Lt. Handlon, a state's witness, was permitted to testify as to oral admissions made by appellant while in police custody in Los Angeles. On the record before us, we do not consider these circumstances to be error.

William Green, the victim, was murdered in Las Vegas

the evening of August 11, 1961. Appellant Beasley was taken into custody in the early morning hours of August 15 in Los Angeles. He was held at the Los Angeles Police Station until the late evening of August 17 when he was released. While thus detained he was interrogated by Lt. Handlon of the Las Vegas Police Department and other officers, state and federal. Lt. Handlon was permitted to testify to his conversation with appellant over objection of his counsel.

The statements consisted substantially of the following:

He had checked into the Carver House alone and had used the name of Joe Brown; he had stayed at the Melody Motel in Los Angeles. He refused to tell Lt. Handlon where he left his automobile. He stated he drove his Chrysler to Las Vegas, stayed at the Carver House, signing the name of Joe Brown, and several men and girls had visited him. He denied knowing the hotel clerk, Bates, and denied that he asked Bates where to find Green. He later admitted that he knew Green, but had had no contact with him in Las Vegas and had just said hello to him. He stated he had seen Green once at a gambling house, but there had been no contact; he did not know what kind of car Green drove. He stated he left Las Vegas about 7:00 o'clock, arriving in Los Angeles at 11:00 o'clock and went to the Red Hut on Washington Street.

A hearing was held outside the presence of the jury at which time appellant Beasley testified he had requested the right to call attorney Barnes at the time of his booking, but was not permitted to do so. He also testified he was given no food for three days except for one meal. The trial judge specifically found against him on these statements and such finding should be accepted here.

Lt. Handlon testified he advised appellant of his constitutional rights on each of three occasions he talked with him while in custody. The only record of the first two conversations is the recollection of Lt. Handlon and appellant. The third conversation was recorded on magnetic tape and was received in evidence. At the time

of the third conversation, appellant Beasley had conferred with a lawyer and refused to answer any questions except to say, "talk to my attorney."

Appellant urges strongly the statements or admissions should not have been received in evidence under the doctrine of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. The Escobedo case has been construed by this Court, Morford v. State, 80 Nev. 438, 395 P.2d 861; Bean v. State, 81 Nev. 25, 398 P.2d 251, and has its limits. One of those limits is stated by the Supreme Court of the United States to be, "We hold only that when the process shifts from the investigatory to the accusative—when its focus is on the accused and its purpose to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

During the entire time Lt. Handlon was interrogating appellant, the process never shifted from the investigatory to the accusative. No criminal action had yet been filed in Nevada; no process issued. The conclusive factor is that appellant was completely released two days later, August 17, 1961, and not rearrested as an accused until several months later. Furthermore, we do not feel the statements elicited were *per se* incriminating.

We do not mean to be understood that police officers are in the slightest way exempted from the mandates of the United States Supreme Court or this Court in respecting the rights of persons accused of crime. We urge a tightening up of their procedure and the exercise of the highest skill in their investigation and accusatory processes to insure that persons lawfully arrested for crime will not escape punishment on technical procedures of interrogation.

4. Did the Court err in permitting a state's witness, Ruby Talley, to testify to statements made to him by one Vase Valrie in the presence of appellant, in which conversation appellant took some part, and were such statements by Vase Valrie hearsay?

The record indicates Vase Valrie and appellant went to the home of Ruby Talley in San Francisco, California.

Valrie introduced Beasley to Talley and commenced a conversation about the victim Green. Over the objection of appellant that it was hearsay testimony, the trial court allowed Talley to repeat the entire conversation. Most of what was said to Talley appears from the record to have been said by Valrie, however Beasley did inject statements from time to time. It was apparent that Talley was previously acquainted with Valrie, but not Beasley because he testified Valrie introduced Beasley to him.

Valrie asked Talley if he had seen Green; that he was looking for Green because he felt Green could help him in a case pending; and that Green might be hiding.

Talley answered he had not seen him around San Francisco.

Beasley, according to Talley's belief, stated he had not saw [seen] him (Green) around Oakland.

In answer to a question by the District Attorney about a beauty shop owned by Green's mother in Santa Cruz, the record reflects the following testimony of Talley:

"Q. And what did Beasley and Valrie say about that, if anything?

"A. Valrie knew of it, I believe.

"Q. Did Beasley say anything about that?

"A. Just generally.

"Q. Just generally?

"A. I can't be sure, he was just there during the conversation and in agreement.

"Q. What did he say?

"A. I don't know exactly what he said."

The record indicates another question to Talley by the District Attorney:

"By Mr. Marshall: Q. Will you tell us how the conversation ended?

"A. That if I should see Green I was to contact Harris and Beasley and Valrie were in close contact with each other, if I should see Beasley to let him know."

It was not indicated by the witness who said those words, whether Valrie or appellant, but both were there. There was no cross-examination by appellant's counsel to clarify the speaker. Under the circumstances, it could

have been either and this Court will not presume to say it was Valrie instead of appellant who made the statement.

Appellant urges any testimony of Valrie should be excluded as hearsay under the doctrine of People v. White, 44 Cal.App.2d 183, 112 P.2d 60. From the record quoted above it would be impossible to eliminate Valrie's statements, but yet leave before the jury the statements of Beasley, which are clearly admissible. The rule stated in 20 Am.Jur., Evidence § 555, at 467, therefore controls. It states:

"An objection that a statement is hearsay is not available as to a statement made in the presence of the party against whom the statement is offered in evidence and in a conversation in which he took part."

The trial court made no error in admitting the testimony.

5. Appellant contends that it was error for the trial court to limit cross-examination of certain of the state's witnesses on the length of time they had been addicted to narcotic drugs. Ruby Talley and Billy DeWayne Reed were both called as witnesses for the state. The evidence indicated both had, at one time or another, used and were addicted to narcotic drugs.

Appellant's counsel sought to cross-examine Talley whether he had been using narcotics for a period of two years prior to his conversation with Vase Valrie and Beasley. The court allowed the witness to state he had been using narcotics for one year prior to the conversation but sustained an objection to the two-year period as being remote.

The court refused to require witness Reed to bare his arm to the jury for evidence of fresh needle marks or scars as requested by appellant's counsel on cross-examination.

Both rulings are challenged as error under the doctrine of Effinger v. Effinger, 48 Nev. 205, 209, 228 P. 615, 239 P. 801.

The record indicates the trial court permitted extensive cross-examination of both witnesses as to their felony criminal records, their habitual use of narcotics,

their poor moral character and other impeaching evidence which would tend to render them less worthy of belief by the jury.

It is true the Effinger case, supra, at page 215 of the Nevada Report, holds that an expert witness could be called to testify that, "The mental confusion and impairment of moral character produced by the habitual use of morphine, cocaine, or a like narcotic are established facts in medical research. That such may be shown for the purpose of affecting the credibility of a witness is also well established. State v. Fong Loon, 29 Idaho 248, 158 P. 233." We reaffirm the Effinger holding. But that is not the issue here. No expert witness was called for such purpose whose testimony the trial court refused to allow to the jury.

■■■■■■

A trial court has wide discretion in the extent of cross-examination of a witness. Facts too remote in point of time or matters too far removed from the scene of the transaction fall within that same discretion. 20 Am.Jur., Evidence § 249, at 243. Smittle v. Illingsworth, 373 P.2d 78, 80 (Okl. 1962). State v. Satterfield, 132 P.2d 372 (Mont. 1943).

It is not the fact that the trial court permitted no cross-examination on these subjects, but in its discretion, limited it because of remoteness. There was no abuse of discretion.

Appellant cites the case of People v. Lewis, 25 Ill.2d 396, 185 N.E.2d 168, which reversed a conviction because the trial court refused to require one witness to remove his coat and display his arm to the jury for needle marks and scars as evidence of use of narcotics. There, however, that witness was the principal witness for the state and the conviction stood or fell upon the credibility of his testimony. Such is not the case here. Reed was an important witness to the state, but not the principal witness. Upon a retrial, it might be desirable to allow greater latitude in that area of cross-examination. But we cannot say it was error not to, as shown by the entire testimony, both direct and cross, of these two witnesses.

6. Appellant complains it was error for the trial court to allow state's witness DeWayne Wolfer to testify the kind of gun which killed Green was a .25 caliber Beretta type semi-automatic pistol. The witness qualified as an expert on firearms, conducted extensive tests on various exhibits admitted in evidence and came to the above conclusion to which he was allowed to testify before the jury. The error complained of creeps in when a box top of a Beretta pistol, marked for identification, but never admitted in evidence, was observed by the jury. But the court properly and effectively admonished the jury to disregard the box top until it was admitted in evidence. It was never admitted. We find no error.

7. Appellant contends it was error for the trial court to allow Leonard Eagle, a state's witness, to testify that appellant purchased an automobile from him shortly after Green was killed. He says such evidence can be material only upon proof of three factors:

(1) The prior impecunious state of the defendant.

(2) The sudden acquisition of wealth.

(3) The logical connection between the crime and the acquisition of funds.

He cites as authority Neal v. United States, 102 F.2d 643, Annot., 123 A.L.R. 119, and Williams v. United States, 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509.

Another state's witness, Billy DeWayne Reed, testified he had a conversation with appellant Beasley in the Los Angeles County Jail in approximately January, 1962, while they were both in custody. Reed said Beasley told him in the conversation, ". . . he was given $2,000.00 in front and the balance of the money after the job was completed or the killing (of Green) was completed." Reed also said Beasley told him, ". . . he went up north, and he bought him a new Cadillac and he was going to parties and spent money and bought him a 1961 black Cadillac with red upholstery."

Eagle was allowed to testify, over appellant's objection, that he had a conversation with Beasley in Los

Angeles on August 13, 1961, that Beasley was interested in purchasing an automobile, a 1960 Cadillac, and in a short time consummated the transaction.

The testimony of Eagle corroborated that of Reed as to what Beasley told him. 22A C.J.S., Criminal Law § 530(1), at 232, defines corroborating evidence as follows:

"Corroborating evidence supplementary to, and tending to strengthen or confirm, that already given."

32A C.J.S., Evidence § 1016, at 622, treats the subject of corroborating evidence thus:

" 'Corroborative' or 'corroborating' evidence has been defined as additional evidence of a different character to the same point; evidence which would tend to establish the disputed facts by other circumstances; evidence which tends to confirm and strengthen, or to show the truth or probability of truth of the testimony of a witness sought to be corroborated."

There was no error in admitting Eagles's testimony.

8. Appellant complained of error in the manner the jury was instructed and the inferences to be drawn therefrom. We do not feel constrained to pass upon the contention in view of the action we have taken above.

On the retrial of the appellant, however, we call to the attention of the trial court, and particularly the District Attorney, the following authorities as to permissible limits of comment on a defendant's failure to take the witness stand.

In Brooks v. District of Columbia, D.C.Mun.App., 48 A.2d 339 (1946), the Municipal Court of Appeals for the District of Columbia said at 341:

"Here defense counsel objected vigorously and immediately to the comment by the prosecutor. The trial judge's only comment was 'Go ahead.' Defense counsel then again demanded a mistrial be declared, but the trial judge only said again to the prosecutor 'Go ahead.' It was later, that the judge for the first time instructed the jury on the subject.

"We have reached the conclusion that under all the circumstances the incident constituted such prejudicial error as calls for a reversal of the judgment. By the trial

judge's failure to rebuke the prosecutor immediately for his remarks and by his waiting until after argument to even mention the law on the subject, we believe that the right of the defendant to a fair trial was invaded. The case is different from those involving behavior of prosecutors not covered by statute. The law forbids any comment being made regarding the failure of the defendant in a criminal case to take the witness stand. All prosecutors are thoroughly familiar with this rule. To say that it may be violated with impunity and the violation cured by a mere routine instruction is apt, we fear, to encourage further violations. We are unwilling to give such encouragement."

In Smith v. United States, 9 Cir., 268 F.2d 416, the Ninth Circuit Court of Appeals held on page 420:

". . . Error is also predicated upon the failure of the trial court to make plain to the jury, by admonition to the United States Attorney or specific instruction to the jury, that a defendant is not required to produce evidence against himself or in his defense and that the failure of defendant to testify cannot be commented upon or referred to in argument.[2]"

In Coleman v. Denno, 223 F.Supp. 938, 944 (N.Y. 1963), affirmed 330 F.2d 441, the District Court said:

"Thus, in New York a mere indirect allusion to failure to take the stand is not in itself grounds for invalidating a guilty verdict if the trial judge has taken appropriate steps to rectify any misapprehension which may have arisen in the minds of the jury. Indeed, it is 'the duty of the court promptly to interrupt a prosecuting counsel who should so far forget himself and the duties of his office as to attempt to make use of the fact in any way to the prejudice of a person on trial.' Ruloff vs. People, supra, 45 N.Y. at p. 222. The question is whether under

[2] "While there was a general instruction buried among the rest that defendants had a right to elect not to take the witness stand and that the jury should draw no unfavorable inference against them on that account, this instruction was not sufficiently connected nor sufficiently forceful to overcome the reference by the prosecuting attorney to defendants and their failure to rebut the evidence against them. Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650."

all the circumstances an improper allusion of this character affected the fundamental fairness of the trial or might have influenced the jury against the accused."

9. Appellant complains he was deprived of due process of law for failure of the court to speedily appoint counsel following his arrest. We have examined the record closely on this point and find no merit to this contention.

10. Did appellant suffer an unconstitutional infringement upon his right to remain silent?

The trial court permitted state's witnesses Callie Mae Watson, Edgar Richard Lewis, Carl Fulton and Billy DeWayne Reed to testify to certain admissions made by appellant over the objection the statements were hearsay. Appellant contends these were admissions of a party as distinguished from admissions against interest, and that being admissions of a party were not admissible until the appellant waived his right to remain silent. Appellant never took the witness stand.

Appellant told Callie Mae Watson he was a "gangster."

In August, 1961, after Green was killed, appellant and Edgar Richard Lewis had a conversation in Los Angeles which was testified to verbatim by Lewis as follows:

"A. Well, it so happened that when I came into the place Beasley was at the bar drinking a soft drink and I came over and he spoke to me and I spoke to him and I asked how everything was going and he said okay. He asked me if I saw the papers where he had been picked up concerning the Green affair and I told him I had heard about it but was not sure it was him. In turn he said it was him and that they didn't have anything on him unless he told something on himself."

In January, 1962, while appellant was in jail in Los Angeles, he had a conversation with Billy DeWayne Reed, a witness called by the state. Following is a verbatim report of the testimony allowed to go before the jury:

"By Mr. Marshall: Q. Mr. Reed, will you tell us what was said in this conversation between you and Mr. Beasley?

"By Mr. Santa Cruz: Your Honor, we want questions and answers.

"By Mr. Delanoy: We object on the ground that it is hearsay, Your Honor.

"By the Court: The objection will be noted and the objection is overruled and counsel's suggestion will be followed. We want the exact conversation as nearly as this defendant can—or this witness can remember.

"By Mr. Marshall: Q. I want you to tell us what Mr. Beasley said and what you said, or what you asked Mr. Beasley and what Mr. Beasley answered.

"A. I said to Mr. Beasley, 'I see that you made headlines,' and he told me, he laughed and he said, 'Yes,' and I asked him what happened? and he said that Patterson, Valrie and Dickie Black had called a meeting to kill an informer who testified in a narcotic trial, and he said that he was offered four thousand or five thousand to do the killing. He was given, he said, he was given $2,000 in front and the balance of the money after the job was completed or the killing was completed.

"Q. Was there any conversation concerning who this informant was?

"By Mr. Santa Cruz: Object to leading the witness, Your Honor.

"By the Court: Sustained.

"By Mr. Marshall: Q. All right, would you state what conversation there was, if any, with regard to this informant?

"By Mr. Santa Cruz: Again leading the witness, Your Honor.

"By the Court: Sustained.

"By Mr. Marshall: Q. What was the balance of the conversation, if any?

"A. He said that he and Dickie Black came to Las Vegas to see Green, he said that Green had come down from San Francisco as an informer and he was introduced to another fellow by the name of Walter Morris.

"By Mr. Santa Cruz: What was that name?

"A. Walter Morris, and Walter Morris was seen riding around with the fellow informer. He said that he came to Las Vegas, him and a fellow by the name of Dickie Black, and he tricked Green out of the hotel by the name of Carver House into the car. Dickie Black was supposed to be in the front seat of the car and he tricked Green into the car and he got in the back seat of the car. They was talking to Green, then he got out and got out of the car for some reason and came back and leaned on the front door of the car and talking to him and then shot him.

"Then he had taken me around on the conversation of how he went up north and he bought him a new Cadillac and he was going to parties and spent money and bought him a 1961 black Cadillac with red upholstery, he said. And he was awful—he said that he was awful mad because—

"By Mr. Santa Cruz: We can't hear the witness.

"By the Court: Speak up.

"By the Witness: He said he was mad because he was given the two thousand in front and didn't get the rest of the money after he did the job and that if things would happen—that they knowed that they shouldn't cross him like that by not giving him the rest of his money.

"By Mr. Marshall: Q. What other conversation, if any, was there concerning the manner in which Green was killed or was to be killed?

"By Mr. Santa Cruz: Object to leading, he has already testified to that matter, Your Honor.

"By Mr. Marshall: Q. Do you recall any further conversation at all?

"A. Yes.

"Q. Relate that, please.

"A. First he was telling me how—he said that the first method they was going to use to kill, an idea by Valrie, to give a shot, a hot shot of narcotics, a pure shot of narcotics, heroin, and they reneged on that and decided to shoot him.

"Q. Was this narcotics in any way described?

"By Mr. Santa Cruz: I object to leading the witness, Your Honor.

"By the Court: Sustained.

"By Mr. Marshall: Q. Did Mr. Beasley describe these narcotics at all?

"By Mr. Santa Cruz: Your Honor, we object to leading this witness, we want conversation, not any leading and suggestive questions.

"By Mr. Marshall: Q. What conversation, if any, was held concerning the description of the narcotics?

"By Mr. Santa Cruz: Object to leading, Your Honor.

"By the Court: Sustained.

"By Mr. Marshall: Q. Was there any remaining conversation?

"A. Yes.

"Q. What was it?

"A. The only thing I can remember him saying was that the narcotics was in a balloon, that is all I can remember about that.

"By Mr. Marshall: No further questions."

Next, the state called Carl Fulton as a witness who testified before the jury he had a conversation with appellant Beasley at a sandwich stand in the 2700 block, Western Avenue, Los Angeles, during December, 1961. The verbatim transcript of Fulton's testimony is as follows:

"A. I entered the stand, you know, it is an open place, and I saw Beasley and I said, 'Say, man, I heard you got into, you know, some trouble,' and he said, 'It is nothing, it is nothing.' And I said, 'What happened?' and he said, 'I did to a snitch what should be done to all snitches.' And I said, 'What was that?' and he said, 'I shot him in his mouth,' and the conversation ended and so I told him 'Is that your car?' and he said, 'Yes,' and started talking about the car and he said he was going to New York or something to get a new car."[1]

---

[1]On cross-examination of Fulton by appellant's counsel, it was brought out that Beasley was in jail in Los Angeles the entire month of December, 1961, and could not have had the conversation with Fulton at the time testified to by him. It is impossible to tell if the jury gave Fulton's testimony any credit.

Appellant urges the above testimony inadmissible against him under the doctrine of Griffin v. California, (decided April 28, 1965) 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, wherein the United States Supreme Court held the following instruction of the trial court to be an unconstitutional infringement upon the right of the defendant to remain silent:

"As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are more probable."

Appellant also urges the only method of removing the infringement upon the constitutional right to remain silent is to give a cautionary instruction that hearsay testimony is unreliable and should be viewed with distrust. He quotes from People v. Bemis, 33 Cal.2d 395, 202 P.2d 82, 84:

"The trial court did err, however, by failing to instruct the jury that evidence of the oral admissions of defendant ought to be viewed with caution. The dangers inherent in the use of such evidence are well recognized by courts and text writers."

The requirement of such instruction is by statute. We have no such statute in Nevada.

The theory is novel, but we do not believe it to be the law, either of Nevada or the United States.

Jones on Evidence, 5th ed., Vol. 2, § 334 at 630 and 631, states:

"In contrast to declarations against interest under that exception to the hearsay rule, statements or declarations previously made by a person now a party to the action are admissible against him at the trial free of the limitations peculiar to the 'declarations against interest' exception. . . .

"When an out-of-court statement is offered in evidence against a party for the purpose of proving the truth

of the facts asserted in the statement it is readily apparent that the hearsay rule is involved and the statement is thus exceptionally admitted. Some authorities have treated admissions as non-hearsay in character and outside the rule. But it is relatively unimportant whether we accept one theory or another as the underlying basis for admissibility. The fact of admissibility (on a broad base but with the definite limitation that the statement may be used only against the party making it) is the important thing.

"It is really not necessary to say that the statement must be against some interest of the party, although it usually is. The real test is whether the statement is helpful to the adversary offering it in evidence. If it does not help the cause of the adversary or hurt the cause of the defendant in the action it is barred from use, as irrelevant, as only the adversary may offer it. . . ." Further, section 336 of Jones, at pages 635 and 636, states:

"If testimony is of such a character as to constitute an admission of the party, it is not necessary to lay a foundation for its reception by first asking the party if he has made such a statement. Nor need the statement, at the time when it was made, appear to have been against the interest of the party. The statement is admissible if at the time of the trial it is inconsistent with the contention of the party who made it. It is admitted as substantive, and not merely as impeaching, testimony."

The statements admitted were clearly inconsistent with appellant's position. He had entered a plea of "not guilty" to the charge. Likewise, they were voluntary. There is no evidence indicating compulsion, fraud, duress, or force which rendered them other than the "product of an essentially free and unconstrained choice by its maker." Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037, 1057. We see no merit to this contended error.

11. The final error contended by appellant is insufficient legally admissible evidence to support a conviction, as to the trial as a whole. We deem it unnecessary to pass upon this contention.

The conviction is reversed. Appellant is remanded for a new trial.

THOMPSON and BADT, JJ., concur.